UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/22/16

VALERIE A. VICARI,

                                Plaintiff,

                         - against -

CAROLYN W. COLVIN,

                              Defendant.

**REPORT AND
RECOMMENDATION**

13-CV-7148 (PGG) (RLE)

To the HONORABLE PAUL G. GARDEPHE:

## I.   INTRODUCTION

Plaintiff Valerie Vicari ("Vicari") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Social Security Disability Insurance ("SSDI") benefits.

Before the Court are the Parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Doc. No. 11, 21.) Vicari raises three issues: (1) the Administrative Law Judge ("ALJ") failed to accord adequate weight to the opinion of the treating physicians; (2) the ALJ failed to properly evaluate Vicari's credibility; and (3) the ALJ failed to properly consider the vocational evidence. (Plaintiff's Memorandum of Law in Support ("Pl. Mem.") at i.) Vicari seeks reversal of the Commissioner's final decision or, in the alternative, remand for a new hearing. (Pl. Mem. at 1.) The Commissioner argues that the finding that Vicari was not disabled under the Act during the period at issue[1] is legally correct

---

[1] The period at issue runs from February 19, 2009, the date Vicari alleges that she became disabled, to April 10, 2012, the date of the ALJ's Hearing Decision.

and supported by substantial evidence, and asks the Court to affirm the Commissioner's decision.  (Defendant's Memorandum of Law in Support ("Def. Mem.") at 1.)

For the reasons that follow, I recommend that Vicari's motion for judgment on the pleadings be **GRANTED**, the Commissioner's motion for judgment on the pleadings be **DENIED**, and that the case be **REMANDED** for further administrative proceedings.

## II.    BACKGROUND

### A.    Procedural History

Vicari applied for SSDI benefits on November 10, 2010, with the assistance of a non-attorney representative.  She alleged disability beginning on February 19, 2009, because of benign paroxysmal positional vertigo,[2] situational anxiety,[3] and migraines/headaches.  (Pl. Mem. at 1; *see also* Transcript of Administrative Proceedings ("Tr.") at 155.)  The Social Security Administration ("SSA") initially denied Vicari's application on March 22, 2011.  (Tr. at 80–83.) On April 11, 2011, Vicari filed a written request for a hearing before an ALJ.  (Tr. at 88–89.) Vicari's request was granted and, on March 19, 2012, she appeared and testified by video teleconference at a hearing before ALJ Michael A. Rodriguez.  (Tr. at 35–71.)  In a decision dated April 10, 2012, the ALJ found that Vicari was not disabled and was not eligible for SSDI benefits.  (Tr. at 18–26.)  Vicari requested a review by the Appeals Council on May 14, 2012. (Tr. at 12–14.)  On August 14, 2013, the Appeals Council denied Vicari's request, and the ALJ's decision became the Commissioner's final decision.  (Tr. at 1–6.)

---

[2] "Benign paroxysmal positional vertigo is one of the most common causes of vertigo — the sudden sensation that you are spinning or that the inside of your head is spinning."  It is "usually triggered by specific changes in the position of your head" and "causes brief episodes of mild to intense dizziness."  *Benign paroxysmal positional vertigo (BPPV)*, MAYO CLINIC (May 28, 2015), http://www.mayoclinic.org/diseases-conditions/vertigo/basics/definition/con-20028216 (last visited Feb. 13, 2016).

[3] Situational anxiety is "a state of apprehension, discomfort, and anxiety precipitated by the experience of new or changed situations or events."  *Situational anxiety*, THE FREE DICTIONARY (2003), http://medical-dictionary.thefreedictionary.com/situational+anxiety (last visited Feb.13, 2016).

**B.**    **The ALJ Hearing**

**1.**    **Administrative Hearing Testimony**

Vicari was born on October 18, 1965.  (Tr. at 134.)  She is five feet, four inches tall and weighs 140 pounds.  (Tr. at 42.)  Vicari is a high school graduate and licensed as a Certified Insurance Service Representative.  (Tr. at 43-44.)

Vicari worked as an insurance underwriter for nine years.  (Tr. at 45–46.)  At the ALJ hearing, Vicari testified that her job responsibilities included a "tremendous amount of computer and [] phone work."  (Tr. at 46.)  She processed high volumes of technical information, accepted and denied applications, and discussed policies and procedures with agencies.  (*Id.*)  In February 2009, Vicari stopped working because she experienced a "sudden onset" of symptoms, including dizziness and vertigo.  (Tr. at 43, 45, 50–53.)  She has not worked since.  (*Id.*)

Vicari testified that she went to Johns Hopkins Hospital and underwent a "battery of tests" that "didn't really find anything."  (Tr. at 51.)  She said that her doctors have put her on "many medications," but decided the medications were not "necessarily helping."  They sent Vicari "to a headache specialist because [she] was developing … serious migraine headaches."  (*Id.*)  Vicari indicated that the headaches began affecting her "within a couple of weeks" after she was first unable to work because of the vertigo.  (*Id.*)  She also testified that her doctors instructed her to do home exercises but they "did not help," and that the doctors told her to stop because they made her symptoms worse.  (*Id.*)

Vicari also testified about her prescription history.  (Tr. at 52–55.)  She was initially prescribed Amoxicillin because she was being treated for "flu-like symptoms."  (Tr. at 52.)

3

Vicari's primary-care physician then sent her to a neurologist who started her on Clonazepam[4] and several migraine headache prescriptions, including Relpax, but the medications "[did not] seem to curb the headaches at all." (*Id.*) Vicari testified that she always has a dull headache and, at the onset of more severe headaches, she tries to take Advil before she takes Imitrex.[5] (Tr. at 53.) When the ALJ asked whether the Imitrex actually helps, Vicari testified that there are some times where it "help[s] right away" but typically it is only effective after she goes "into a dark room" to lie down "for hours at a time." (*Id.*) Vicari testified that she is taking Meclozine for dizziness, Acetazolamide for ear pain, and Oxycodone for her back pain. (Tr. at 55.) She further testified that her daily dose of Cymbalta is the only thing that helps with her dizziness and inflammation, and that it helps a bit with her carpal tunnel. (Tr. at 63.) However, the Cymbalta sometimes puts her in "a fog" and her medications generally make focusing and concentrating difficult. (Tr. at 63–64.) The feeling of "walking in a fog" can last "for a day or two." (Tr. at 64.)

Vicari testified that her daily activities vary, depending on how she feels when she wakes up. (Tr. at 56.) If she is having "bad day," with headaches and vertigo, she will sometimes stay in bed and not get dressed. (*Id.*) Sometimes she tries to "get a cup of coffee to see if that will help." (Tr. at 57.) She takes two to three naps per day. (*Id.*) Sometimes she feels a "window of opportunity to function" so she tries to "put dishes away or do a little bit of laundry," but even minor physical activities exhaust her and she needs to lie down. (*Id.*) She emphasized "everything just seems to completely exhaust" her. (Tr. at 57.)

---

[4] Clonazepam is used to treat seizure disorders and panic disorders. *Clonazepam (Oral Route)*, MAYO CLINIC (Dec. 1, 2015), http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited Feb. 13, 2016).
[5] Imitrex is used to treat migraines by relieving pain and related symptoms. *Imitrex*, WEBMD (2005), http://www.webmd.com/drugs/2/drug-11571/imitrex-oral/details (last visited Apr. 5, 2016).

Vicari testified that she has been "on a few vacations" in the three years since the onset of her symptoms but she was mostly confined to the hotel, unless her husband was available to drive to the beach. (Tr. at 58.) She testified she "would just kind of sit on the beach. There was no scuba diving, no snorkeling, none of that." (*Id.*) Vicari provided additional testimony about her activities, testifying that she listens to music at times and watches television on a limited basis because her eyes go blurry and she gets very fatigued. (Tr. at 59.) She checks her email for about fifteen minutes per day. (*Id.*) On days where she is feeling better, her daughter will take her to the mall, to "try and live a normal life," but "at the onset of a headache, they … leave." (Tr. at 60.)

When asked to describe a vertigo experience, Vicari said that she typically feels "an imbalance," and has fallen "a couple times." (Tr. at 62.) She explained that she has learned to look down, rather than straight ahead, to "compensate" for the imbalance. (Tr. at 63.) She further noted that there are still times where the vertigo comes on suddenly when she lifts or turns her head. (*Id.*) Vicari further testified that driving "make[s] the symptoms worse," and "[r]eading makes the headaches worse." (Tr. at 63.) She explained that she can "barely make it through" a page of a novel "before [a] headache starts bothering" her and she gets "completely exhausted." (*Id.*)

Vicari also testified about hearing loss in her right ear, with feelings of fullness and pressure. (Tr. at 60-62.) She testified that she "cannot put a phone" or "anything in that ear due to the vibration." (Tr. at 61.) When the ALJ asked Vicari what her doctors have said about this, she testified that there is "no cause … to this date. They're still looking into it." (*Id.*) She said doctors frequently tell her she is a "difficult case." (*Id.*) She explained that she has had her

hearing levels checked and there is an indication of actual hearing loss in her right ear. (*Id.*) Vicari described the feeling in her right ear as similar to "a knife stab." (Tr. at 62.)

When the ALJ asked about the success and/or effectiveness of Vicari's treatment for vertigo, Vicari testified that there have been "no results." (Tr. at 50.) She said her dizziness is "not as constant as it was in the very beginning," but it continues to manifest "like a whirling sensation." (*Id.*) She went on to testify that the symptoms that began suddenly in February 2009 are the same, "if not a little worse at times," and that her pain varies day-to-day. (Tr. at 54.)

In August 2010, Vicari was involved in a motor vehicle accident. (Tr. at 47.) After the accident, she developed tennis elbow in her right arm and back pain. (Tr. at 48-49.) She noted that although the elbow pain, which manifests as a tingling sensation or numbness in her fingers, "comes and goes," the "two cortisone shots" she has been given "[did not] seem to be working." (Tr. at 48.) Vicari also said that she was scheduled to return to her doctor two weeks after the hearing "to discuss a possible surgery." (*Id.*)

After ALJ Rodriguez questioned Vicari, David Meredith, a non-attorney representative appointed to represent her in February 2012, elicited testimony that Vicari's physical impairments have negatively impacted her personal hygiene. (Tr. at 65.) Vicari testified that she does not "shower every single day" or "take care of [her] hair … because of the dizziness." (*Id.*) After two days without showering, when Vicari "can't handle it anymore" she asks her daughter for assistance with the shower. (*Id.*) ALJ Rodriguez then asked Vicari whether she had any source of income other than her husband's. (Tr. at 66.) Vicari testified that she is on long-term disability, until she is sixty five, and receives about $2,400 per month. (Tr. at 66–67.)

ALJ Rodriguez next asked Vocational Expert Pat Green ("Green") about a hypothetical individual of Vicari's age, education and work experience, whose residual functional capacity ("RFC"):

> is to sit for six hours out of an eight-hour workday; standing and walking two out of eight; lifting and carrying ten pounds; no ropes, ladders, or scaffolds; occasional stairs and ramps; occasional balancing and stooping; no kneeling, crouching or crawling; she could engage in frequent overhead distance and directional reaching; frequent fine and gross manipulative functions, bi-laterally.  She should avoid exposure to workplace hazards, such as moving machinery and heights.  She should avoid exposure to loud noises.  She [is] limited to unskilled jobs of a low stress variety defined as only occasional decision-making or exercise with judgment in the job performance.   She can have occasional interaction with the public, infrequent work-related interaction with co-workers.

(Tr. at 68.)  Green testified that, assuming the hypothetical RFC, Vicari could not perform her past relevant work.  (Tr. at 68–69.)  He indicated, however, that there were alternative jobs that such an individual could do, such as order clerk, sorter, and addresser.  (Tr. at 69.)  He said that these jobs were a representative, not exhaustive, list.  (*Id.*)  ALJ Rodriguez then modified the hypothetical, instructing Green to assume the same RFC, but adding:

> [T]he Claimant's going to need additional time off[-]task.  She's going to miss two days of work on a monthly basis.  In, [] addition, she's going to need 15 percent of the workday, off[-]task, on demand, and she has to be able to isolate and be in a private area away from work space, so like a break room or something like that.  But that 15 percent of the day is in addition to regularly scheduled work breaks and lunch, and has to be exercisable by her on demand, without having to seek supervisory approval every time she needs to use that time.

(*Id.*)  Green testified that, given the newly presented information, Vicari would not be able to do the alternative jobs he had previously identified or any other alternative position.  (Tr. at 69–70.)

7

2.    **Medical Evidence**

a.    **February 2009–May 2009**

Dr. Jennifer Horn served as Vicari's primary care physician, treating and evaluating her

for all health conditions from February 2009 through January 2012.  Soon after the sudden onset

of Vicari's symptoms, Dr. Horn noted that Vicari experienced dizziness and felt like the room

was spinning while she was on the examination table.  (Tr. at 368.)  She was positive for

nystagmus.[6]  (*Id.*)  Vicari's hearing was grossly intact and her eardrums were normal.  (*Id.*)  Dr.

Horn assessed Vicari as having benign paroxysmal positional vertigo.  (Tr. at 369.)  She noted

that Vicari could not return to work until March 2, 2009.  (Tr. at 370.)

On March 2, 2009, Dr. Horn found that Vicari was in "[n]o apparent distress," but

determined that she could not return to work until March 5, 2009.  (Tr. at 365, 367.)  Dr. Horn's

supervisor, Dr. J. Roberto Vergara, subsequently noted that Vicari could not return to work until

March 9, 2009.  (Tr. at 363.)  On March 9, 2009, Dr. Horn reported that Vicari voluntarily

restricted her head movements because she felt off-balance.  (Tr. at 361.)  On March 16, 2009,

Dr. Horn found that Vicari was negative for headaches, but positive for right ear hearing loss;

pain; tinnitus, or ringing; and vertigo.  (Tr. at 358.)  Vicari was not in acute distress but still

restricted her head movements.  (*Id.*)  Dr. Horn determined that Vicari should be excused from

work with an "estimated," though uncertain, return in about four weeks.  (Tr. at 360.)  On March

27, 2009, Dr. Horn found that Vicari was positive for right-ear hearing loss and pain, and

vertigo.  (Tr. at 354–55.)  She referred Vicari to a specialist for evaluation, and treatment for

vertigo and vestibular neuritis.  (*Id.*)  Dr. Horn noted that Vicari was excused from work for one

month, with the ability to return on April 27, 2009, and could not drive.  (Tr. at 356.)

---

[6] Nystagmus describes "fast, uncontrollable" eye movements.  *Nystagmus*, U.S. NATIONAL LIBRARY OF MEDICINE (Feb. 3, 2015), https://www.nlm.nih.gov/medlineplus/ency/article/003037.htm (last visited Feb. 13, 2016).

On April 27, 2009, Dr. Horn reported that Vicari was positive for right ear hearing loss and pain, and vertigo," but wrote in the notes on Vicari's physical examination that Vicari's hearing was "grossly intact." (Tr. at 351). Dr. Horn also found that Vicari was starting to get depressed over her condition, had crying spells and anxiety because she still could not work or drive, and was uncertain of the duration of her impairments. (*Id.*) Dr. Horn noted that Vicari was excused from work for eight more weeks, with the ability to return on June 22, 2009, and could neither drive nor sit for long periods. (Tr. at 353.)

On March 12, 2009, Dr. Kweon Stambaugh, a board certified otolaryngologist,[7] evaluated Vicari, noting that Vicari was "feeling much better," did not show signs of headache, hearing loss, dizziness, or emotional disturbances. (Tr. at 208–09.) He did, however, report vertigo and that Vicari "probably ha[d] vestibular neuritis."[8] (*Id.*) Notes from an appointment on March 24, 2009, showed similar results. (Tr. at 214.) On March 18, 2009, tests by Dr. Deborah Lynn, an audiologist, revealed "normal hearing in both ears, except for a slight loss … in the right ear." (Tr. at 216, 218, 385.)

On April 9, 2009, Dr. Paul Hammerschlag, a board certified otolaryngologist, ordered a CT-scan of Vicari's temporal bone and on April 15, 2009, he ordered an MRI of her brain and internal audio canal. (Tr. at 253–55.) Both tests results were "normal." (Tr. at 695.) On May 20, 2009, Dr. Hammerschlag completed an Attending Physician Statement for Vicari's insurance provider in which he diagnosed her with atypical Meniere's Disease[9] and commented that "it is

---

[7] Otolaryngologists treat diseases of the ear, nose, throat, head and neck. *Otorhinolaryngology (Ear, Nose & Throat)*, MAYO CLINIC HEALTH SYSTEM (2012), http://mayoclinichealthsystem.org/locations/la-crosse/medical-services/otorhinolaryngology (last visited Apr. 5, 2016).

[8] Vestibular neuritis is a viral infection of the vestibular nerve that "can cause intense, constant vertigo." *Dizziness*, MAYO CLINIC (2012), http://www.mayoclinic.org/diseases-conditions/dizziness/basics/causes/con-20023004 (last visited Apr. 5, 2016).

[9] "Meniere's disease is a disorder of the inner ear that causes episodes in which you feel as if you are spinning (vertigo), you have fluctuating hearing loss with a progressive, ultimately permanent loss of hearing, ringing in the ear (tinnitus), and sometimes a feeling of fullness or pressure in your ear. In most cases, Meniere's disease affects

unclear when [Vicari] will be ready to resume normal activities; it depends on how well she does with vestibular therapy." (Tr. at 573–74.)

### b.      June 2009–September 2009

On June 1, 2009, Dr. Horn wrote that Vicari was positive for right ear hearing loss and pain, vertigo, and was depressed, but not anxious. (Tr. at 347.) She referred Vicari to Dr. Weintraub, a specialist, to treat her for vertigo. (Tr. at 348.) Dr. Horn noted that Vicari was excused from work for an additional four weeks, and could neither drive nor work on computers longer than thirty minutes at a time without exacerbating her symptoms. (Tr. at 349.)

Dr. Bernard Weintraub evaluated Vicari from June 2009 through October 2009. (Tr. at 225–30.) At the first appointment, he noted that Vicari was alert and her mental status, coordination, and gait were intact. (Tr. at 225–26.) He performed a tilt test,[10] which was negative for vertigo. (*Id.*) Dr. Weintraub wrote that Vicari "appears to have Meniere's syndrome," noting that "hearing loss, tinnitus and recurring vertigo certainly fits" with that diagnosis. (*Id.*) On June 24, 2009, he saw Vicari again because her prescription for Scopolamine (used to prevent nausea and vomiting) was not working. (Tr. at 227.) He put Vicari on Klonopin, which is used to prevent and control seizures and treat panic attacks. He wrote that Vicari might need surgery and was unable to work. (*Id.*)

On July 29, 2009, Dr. Weintraub wrote that the Klonopin might have helped a bit, and that Vicari was alert, oriented, and exhibited normal speech. (Tr. at 228, 564.) He noted, however, that Vicari was unable to work because of vertigo, drowsiness, and recurrent

---

only one ear." *Meniere's disease*, MAYO CLINIC (Nov. 26, 2015), http://www.mayoclinic.org/diseases-conditions/menieres-disease/basics/definition/con-20028251 (last visited June 16, 2016).

[10] Tilt table tests are used to evaluate causes of unexplained fainting by simulating a change in position from lying down to standing up. *Title table test*, MAYO CLINIC (1998), http://www.mayoclinic.org/tests-procedures/tilt-table-test/basics/definition/prc-20019879 (last visited June 16, 2016).

headaches. (Tr. at 564.) He prescribed Verapamil, and noted that Vicari might need surgery for Meniere's syndrome. (*Id.*) Dr. Weintraub listed Vicari's "current problems" as "benign paroxysmal positional vertigo; meniere's disease; … [and] intractable migraine."[11] (Tr. at 564–65.) On August 26, 2009, Dr. Weintraub wrote that Vicari was still getting dizzy and experiencing consistently painful headaches once per week. (Tr. at 229.)

Dr. Juline Bryson saw Vicari on July 17, 2009, at the St. Luke's-Roosevelt Hospital Center Headache Institute. (Tr. at 312–18.) He diagnosed chronic, persistent migraines, possibly caused by an infected vestibular nerve. (Tr. at 318.) Dr. Bryson prescribed Nortriptyline, which is used to treat depression, and Maxlt, which is used to treat migraines and related symptoms, such as nausea, vomiting, and sensitivity to light and sound. (*Id.*) After Vicari's complaints about insomnia, Dr. Bryson substituted Verapamil, which is used to treat high blood pressure and control chest pain, for the Nortriptyline. (Tr. at 310.) On September 18, 2009, Dr. Bryson reported that Vicari's headaches, with pain in her right temple and ear, had been "constant" for the previous three weeks. (*Id.*)

### c.    October 2009–January 2010

On October 28, 2009, Dr. Weintraub noted that Vicari's ear was "quite painful," so she stopped taking Klonopin. Vicari continued to have dizziness, but her headaches were somewhat better. (Tr. at 230.) On October 30, 2009, Dr. Bryson noted that Vicari's headaches were "somewhat improved," but that her dizziness had not improved and she was having difficulty sleeping. (Tr. at 311.)

On December 18, 2009, Vicari met Dr. David Zee for a "battery of tests" at Johns Hopkins Hospital. (Tr. at 51.) After reviewing the test results, Dr. Zee reported that Vicari did

---

[11] Intractable migraines are resistant to treatment. *Intractable*, THE FREE DICTIONARY (2003), http://medical-dictionary.thefreedictionary.com/intractable (last visited Mar. 6, 2016).

"not [have] typical Meniere Syndrome," but rather it was more likely she suffers from "migraine-related vestibular syndrome" and "psychophysiological vertigo syndrome." (Tr. at 239, 566–70.)  He advised Vicari to "go for counseling and do tai chi." (*Id.*)

On January 1, 2010, Dr. Horn wrote that Vicari still had vertigo, ear pain, hearing loss, and headaches. (Tr. at 345.)  She also wrote that Vicari was anxious, depressed, and had mood swings. (*Id.*)  Dr. Horn instructed Vicari to discontinue use of Zoloft. (*Id.*)

### d.    February 2010–May 2010

On February 12, 2010, Dr. Bryson noted that Vicari experienced dizziness with "weather changes" or physical overextension. (Tr. at 309.)  The dizziness occurred three to four times per week, lasting "until sleep." (*Id.*)  Dr. Bryson diagnosed persistent migraines. (*Id.*)  On February 18, 2010, Dr. Horn wrote that Vicari was negative for hearing loss, but positive for right ear pain and vertigo. (Tr. at 342.)  She also noted that Vicari was depressed. (*Id.*)

On March 18, 2010, Dr. Horn reported that Vicari was positive for right ear hearing loss and pain, was anxious, depressed, and had mood swings. (Tr. at 340.)  On September 24, 2010, Dr. Horn reported that Vicari was fatigued and positive for headache, bone and joint symptoms, and neck stiffness. (Tr. at 338.)  Vicari's spine was positive for muscle spasms and tenderness in her upper- and middle-back. (*Id.*)

Eileen Wein served as Vicari's acupuncturist from March 2010 through January 2011.  During March 2010, Wein saw Vicari three times.  Vicari had experienced dizziness, low appetite, and sleep issues, heard an echo, had pain and ringing in her ear, and had a hollow feeling in her head. (Tr. at 423–24, 426.)  During three appointments in April 2010, Wein noted that Vicari had not had headaches on vacation, but had been dizzy for hours, experienced numbness and tingling in her arms, bruised easily, and had constant ear pain and fullness. (Tr. at

12

422.) Wein wrote that when Vicari stopped moving she experienced ear pain. (Tr. at 421.) She reported that Vicari was also bothered by fluorescent light, experienced constant and worsening dizziness in the car, and had balance issues. (Tr. at 421.)

### e.    June 2010–September 2010

During three June 2010 appointments, Wein noted that Vicari had knee soreness, difficulty going up and down stairs, and stiff, tight fingers. (Tr. at 419.) Vicari had slight bruising behind her right ear, experienced intermittent dizziness, and had varying levels of energy. (Tr. at 418.) The pain in Vicari's right ear was greater than her left ear and she felt lethargic, depressed, and frustrated. (Tr. at 417.)

Wein evaluated Vicari on seven occasions in July 2010. (Tr. at 410–16.) The pain in Vicari's right ear was greater than her left ear, she was not sleeping well because of the pain, and was bothered by humidity. (Tr. at 416.) Vicari could not drive because she was light-headed, and "when [she] stopped working, [the] pain [in her ear] doubled." (Tr. at 415.) During the July 8, 2010 appointment, Vicari experienced congestion in her right ear, but no pain. (Tr. at 414.) Pain was present, however, at the July 12, 2010 appointment. (Tr. at 413.) At the July 15, 2010 appointment, Wein noted that Vicari had driven a short distance the previous night then had lost her balance that night and had fallen at home. (Tr. at 412.) The fullness in her ears had returned and was keeping her awake, but the ear pain was less intense. (Tr. at 410–11.)

Wein saw Vicari four times during August 2010. (Tr. at 406-09.) Vicari was experiencing dizziness and ear pain to varying degrees. (*Id.*) She tried to hike after a slight increase in energy, but experienced ear pain and exhaustion. (Tr. at 406.) Vicari had three appointments with Wein in September 2010. (Tr. at 404–05, 729–31.) Wein wrote that Vicari had whiplash, headaches that were "frontal (zingers)" from the back of the head to the top,

13

buzzing in both ears, and worsening dizziness. (Tr. at 405.) Vicari's spine was positive for posterior tenderness. (Tr. at 729–31.)

On August 31, 2010, Vicari was injured in a motor vehicle accident and taken to the Christiana Care Emergency Room. (Tr. at 269-301.) The cervical CT-scan performed revealed that one of Vicari's intervertebral discs was bulging outside of its normal circumference on her right side and bone spurs on her vertebrae were causing intervertebral disc compression.[12] (Tr. at 271.) An abdominal CT-scan was normal. (*Id.*) A cervical MRI showed disc protrusion and a left tear fissure, but no evidence of nerve compression. (Tr. at 273.)

### f.   October 2010–January 2011

On October 4, 2010, Dr. Bryson noted that the motor vehicle accident had worsened Vicari's pain and she was experiencing daily headaches. (Tr. at 308.) On October 18, 2010, Dr. Horn wrote that Vicari was positive for congestion and hearing loss in her right ear, headache, and posterior tenderness in her spine. (Tr. at 334–35.) A physical examination of Vicari's back revealed bilateral tenderness, but no vertigo. (*Id.*) On November 3, 2010, Dr. Emmanuel Llado submitted results to Dr. Horn regarding a radiographic examination Dr. Horn had requested. (Tr. at 384.) The examination showed no evidence of fracture or dislocation, but did reveal a growth extending from the end of the humerus that forms the upper part of the elbow. (*Id.*)

On December 3, 2010, Dr. Robert Wilkins, a board certified radiologist, examined Vicari on referral by Dr. Horn. (Tr. at 383.) Dr. Wilkins's examination did not identify any fracture but did show the growth on Vicari's humerus that Dr. Llado had identified on November 3, 2010. (*Id.*) On December 8, 2010, Dr. Horn wrote that Vicari was positive for vertigo, noting a

---

[12] Compression causes symptoms such as "pain that radiates to the extremities, tingling, numbness or a pins-and-needles sensation." *Understanding Disc Osteophyte Complex*, LASER SPINE INSTITUTE (2016), https://www.laserspineinstitute.com/back_problems/spinal_bone_spurs/disc_complex/ (last visited March 3, 2016).

history of stable recurring vertigo, and that her spine was positive for posterior tenderness, that she had muscle spasms adjacent to the vertebrae, and that she had lower back pain. (Tr. at 324–25.) On January 10, 2011, Dr. Horn wrote that Vicari was positive for otalgia, or ear pain, on the right side; headache; vertigo; and back pain. (Tr. at 321–22.) Her spine was positive for posterior tenderness, there were no muscle spasms, and a physical examination revealed lower back pain on the right side. (Tr. at 322.)

Vicari attended physical therapy at Access Physical Therapy from October through November 2010. (Tr. at 545–56.) At the initial evaluation, the physical therapist wrote that Vicari was unable to sit, stand, or ambulate for longer than fifteen minutes. (Tr. at 553.) She had tense muscles from her neck to lower back and tennis elbow. (*Id.*) On October 25, 2010, the physical therapist noted that Vicari's range of motion had improved and that she was fluid in her movements. (Tr. at 552.) Notwithstanding these "objective improvements," Vicari reported "only slight improvement in her pain levels, but [was] trying to do more around the house." (*Id.*) On December 15, 2010, a physical therapist noted that Vicari achieved all of her goals of decreased pain, increased strength, improved body mechanics, increased flexibility, and improved spiral stabilization. (Tr. at 551.) Vicari had not achieved her long-term goal of pain-free holding and reaching with her right upper extremity. (*Id.*) Vicari continued physical therapy at Drayer Physical Therapy through January 2012. (Tr. at 441–515, 581–662, 755–848, 862–65.)

Vicari had six appointments with Wein in October 2010. (Tr. at 398-403.) She experienced regular pain in her right elbow, and ringing, pressure, and hearing loss on the right side. (*Id.*) She was negative for vertigo, but positive for headache and back pain. (*Id.*) Vicari had three appointments with Wein in November 2010. (Tr. at 396–98.) Wein wrote that Vicari

"had some energy to get things done," but her dizziness was back, to a lesser degree, and she experienced shooting pains in her ears during bad weather. (*Id.*) Vicari saw Wein three times in December 2010. (Tr. at 394–95, 716–17.) Wein wrote that wind and rain caused pressure in Vicari's head, her right ear pain had returned, she could not sleep on her right side, and she experienced shooting pain. (Tr. at 395.) Vicari had stable recurring vertigo, was negative for headaches, and her spine was positive for posterior tenderness. (Tr. at 716–17.) Her back was a "little sore," but "much better." (Tr. at 394.) Vicari saw Wein five times in January 2011. (Tr. at 390–93, 713–14.) Wein noted that Vicari was exhausted, had difficulty carrying out daily tasks, was feeling out of balance and experienced loss of sleep. (Tr. at 393.) Vicari was positive for headaches, vertigo, and back pain, (Tr. at 713–14.), and her migraine medication was not working. (Tr. at 392.) On January 31, 2011, Wein noted that Vicari was riding her bike and trying to get into shape. (Tr. at 390.) She was more willing to take part in her wellness and was increasingly working out. (*Id.*)

### g. February 2011–May 2011

On February 8, 2011, Dr. Leslie Helprin conducted a psychiatric evaluation of Vicari, on behalf of the SSA. (Tr. at 429–33.) Dr. Helprin determined that Vicari's thought processes were "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia." (Tr. at 30.) Her attention and concentration were "intact." (*Id.*) Her recent and remote memory skills were impaired because of a cognitive deficiency. (Tr. at 431.) Her intellectual skills were below average. (*Id.*) Based on Vicari's statements, Dr. Helprin reported that Vicari:

> [I]s able to dress, bathe, and groom herself. She is able to microwave foods with cooking limited by her physical problems. She is unable to clean, do laundry, or food shopping for the same reasons. She states she is able to manage her own money online.

16

(*Id.*)  The doctor also indicated that Vicari could "follow and understand simple directions and instructions[,] … perform simple … and complex tasks independently[,] … maintain a regular schedule[, and] make appropriate decisions."  (Tr. at 431–32.)  Although there were "some secondary emotional difficulties," Dr. Helprin did not find them significant enough to disrupt Vicari's daily functioning.  (*Id.*)  Vicari was diagnosed with mild episodic adjustment disorder with depressed mood; migraines; vertigo; tinnitus; clogged ears; partial right-ear hearing loss; and tingling and numbness sensations.  (Tr. at 432.)  Dr. Helprin said Vicari's prognosis was "good."  (*Id.*)

On February 9, 2011, Dr. Leena Philip examined of Vicari for the SSA.  (Tr. at 434–38.)  She wrote that Vicari "appeared to be in no acute distress" and did not "complain of dizziness throughout the exam."  (Tr. at 436.)  Vicari's gait was normal, but she was unable to walk on her heels and toes because she stated that she would "lose balance."  (*Id.*)  Dr. Philip also noted that Vicari had tenderness near her left ear.  (*Id.*)  Dr. Philip wrote that Vicari had a decreased ability to bend forward and backward because those actions caused dizziness.  (Tr. at 437.)  Based on Vicari's medical history, Dr. Philip diagnosed Vicari with low back pain, right elbow pain, and chronic migraine headaches.  (Tr. at 437–38.)  Dr. Philip also diagnosed Vicari with vertigo, with symptoms of dizziness, bilateral ear pain, partial hearing loss in her right ear, tinnitus, fatigue, sleeplessness, brain fog, confusion, and forgetfulness (possibly related to migraine headaches).  (*Id.*)  She identified Vicari's prognosis as "fair."  (Tr. at 438.)  Dr. Philip provided a "medical source statement" that Vicari should avoid driving, operating machinery, and heights because of vertigo, and that she had "moderate limitations to repetitive bending, heavy lifting[,] and carrying because of low back pain."  (*Id.*)

On February 9, 2011, Dr. Seymour Sprayregen, a board certified radiologist, administered a lower back x-ray on Vicari for the SSA. (Tr. at 439.) Dr. Sprayregen wrote that the height of the vertebrae and the spaces between the intervertebral discs were "relatively well maintained" and her vertebral arches were intact. (*Id.*) On February 11, 2011, Dr. Horn reported that Vicari had fullness in her right ear, vertigo, a headache, and back pain. (Tr. at 709–11.)

On February 22, 2011, Vicari met with Dr. T. Bruni, an SSA psychological expert, for a mental RFC assessment and psychiatric review. (Tr. at 516–19, 520–33.) Dr. Bruni found that "despite a psychiatric impairment," Vicari is viewed as able to "engage in tasks, relate adequately with others and adapt to change." (Tr. at 516–19.) Dr. Bruni noted that "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" listed in the SSA's "Psychiatric Review Technique" document. (Tr. at 520, 523.) The doctor noted that Vicari suffered from an "[a]djustment disorder with depressed mood" that was "mild [and] episodic." (*Id.*) Dr. Bruni wrote that Vicari had a moderate degree of restriction of daily activities, a mild degree of difficulty in maintaining social function, a moderate degree of difficulty in maintaining concentration, persistence or pace, but no repeated episodes of deterioration. (Tr. at 530.)

On April 13, 2011, Dr. Horn wrote that Vicari was experiencing back pain, and muscle weaknesses, but that her hearing was grossly intact. (Tr. at 700–01.) On May 27, 2011, Dr. Horn evaluated her and found that both eardrums were normal, that she had a tender elbow, and that her lumbar spine was tender. (Tr. at 668.) She noted that Vicari was experiencing ongoing vestibular symptoms with no diagnosis; she diagnosed Vicari with a vestibular disorder, chronic headaches, bulging lumbar disc, and tennis elbow. (Tr. at 669.)

On May 17, 2011, Vicari saw Dr. Steven Weinstein, a board certified physiatrist, or physical medicine and rehabilitation physician with a sub-specialty in pain medicine, for an EMG[13]/NCV[14] test.  (Tr. at 656–62.)  The test revealed evidence of mild carpal tunnel syndrome in the right wrist.  (*Id.*)  Dr. Weinstein advised her to consider using a wrist splint at night and a forearm band, or getting a cortisone injection.  (*Id.*)  On May 18, 2011, at Dr. Horn's request, Dr. Iannone, a board certified radiologist, performed a lumbar MRI, and found a slight bulging on the right side of Vicari's lower back caused by a rip in the outer layer of the fibrous cushion between the vertebrae.  (Tr. at 687–88.)  Other findings were within normal limits.  (*Id.*)

### h.      June 2011–September 2011

On July 6, 2011, Vicari was examined by Dr. Ronald Israelski, a board certified orthopedic surgeon.  (Tr. at 860–61.)  Dr. Israelski found that Vicari suffered from tennis elbow and carpal tunnel syndrome in her right arm.  (*Id.*)  He instructed her to wear a therapy forearm band for the tennis elbow and a splint for the carpal tunnel syndrome, six to eight hours per day. (*Id.*)  He told her that if the condition did not improve she should return for an injection into her elbow.  (*Id.*)  On August 29, 2011, Vicari returned to Dr. Israelski for another examination.  (Tr. at 858–59.)  Dr. Israelski noted that she exhibited "less tenderness" during his examination of her tennis elbow, but injected the elbow with Depo-Medrol, which is used to treat pain and swelling stemming from joint disorders.  (*Id.*)  He instructed Vicari to continue with her armband and follow a "home exercise program."  (*Id.*)

---

[13] Electromyography (EMG) is a diagnostic procedure used to assess the health of muscles and the nerve cells that control them …." *Electromyography (EMG)*, MAYOCLINIC (Oct. 25, 2012), http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183 (last visited March 6, 2016).

[14] A nerve conduction velocity (NCV) test measures the "speed of conduction of an electrical impulse through a nerve" and is used to "determine nerve damage." *Nerve Conduction Studies*, JOHNS HOPKINS MEDICINE (2016), http://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/nerve_conduction_velocity_ncv_92,P07657/ (last visited March 6, 2016).

On July 26, 2011, Dr. Horn filled out a physical capacities evaluation for Vicari, which said that in an eight-hour workday, she could sit for two hours and stand/walk for two hours. (Tr. at 663–66.) In addition, she needed an opportunity to alternate sitting and standing at will throughout the day. (*Id.*) Vicari could use her hands for repetitive motion tasks and could use her feet for repetitive movements, as in operating foot controls. (*Id.*) She could occasionally lift/carry up to twenty pounds, occasionally kneel, crouch, crawl, and reach above shoulder level, but could never climb, balance, or stoop. (*Id.*) She was totally restricted from unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. (*Id.*) Dr. Horn wrote that Vicari suffers from pain, but the reasonable medical basis for the pain had not yet been determined. (*Id.*) Dr. Horn further wrote that the pain was disabling to the extent that it would prevent Vicari from working full-time at even a sedentary position. (*Id.*) On September 13, 2011, Dr. Horn wrote that Vicari had general weakness and arthraigla, or joint stiffness, of multiple joints. (Tr. at 748.) She identified possible causes, including mononucleosis, sinus issues, and pneumonia. (Tr. at 749.)

i.     **October 2011–January 2012**

On October 24, 2011, Vicari returned to Dr. Israelski for a follow-up appointment. (Tr. at 856–57.) He found Vicari's tennis elbow was "resolved," but instructed her to continue using her arm band, perform a "home exercise program," and continue with physical therapy. (*Id.*) On January 16, 2012, Vicari saw Dr. Israelski again. (Tr. at 849–50.) Dr. Israelski found that Vicari had "significant" tennis elbow in her right arm and "right carpal tunnel syndrome." (*Id.*) Israelski administered injection to reduce the pain in Vicari's right elbow. (*Id.*) He instructed Vicari to continue using her arm band and performing home exercise. (*Id.*) On January 31,

2012, Vicari saw Dr. Weinstein again.  (*Id.* at 851–54.)  He found that Vicari's strength was well preserved in her upper extremities but she was experiencing a tingling sensation in her right wrist.  (*Id.*)  Test results also revealed evidence of moderate carpal tunnel syndrome in Vicari's right wrist.  (*Id.*)

On December 28, 2011, Dr. Horn wrote that Vicari's overall range of motion of her neck, shoulders, wrists, and elbows was full and unrestricted.  (Tr. at 742–43.)  Her diagnosis was arthralgia of multiple joints, fatigue, and vestibular neuritis.  (*Id.*)  Dr. Horn noted that she and Vicari had had a "very long discussion," during which Dr. Horn told Vicari that, to proceed with an SSDI appeal, she would need "more recent eval[uation]s from specialists; consultations from one to two years ago [would] not [be] sufficient.  (Tr. at 743.)

On January 1, 2012, Dr. Horn provided another "physical capacities evaluation," in which she said that, in an eight-hour workday, Vicari could sit for less than one hour and stand/walk for less than one hour.  (Tr. at 733–35.)  She noted that these restrictions were "variable" and that Vicari would need an opportunity to alternate sitting and standing, at will, throughout the day.  (*Id.*)  Dr. Horn wrote that Vicari could use her hands for repetitive motion tasks and her feet for repetitive movements, as in operating foot controls.  (*Id.*)  Vicari could occasionally lift/carry up to 100 pounds.  (*Id.*)  Vicari could never balance but could occasionally climb, stoop, kneel, crouch, crawl, and reach above shoulder level.  (*Id.*)  According to Dr. Horn, Vicari is totally restricted from unprotected heights; being around moving machinery; exposure to marked changes in temperature and humidity; driving automotive equipment; and exposure to dust, fumes, and gases.  (*Id.*)  Dr. Horn observed that there is a reasonable medical basis for Vicari's fatigue, but as of January 1, 2012, no clear etiology had been identified and further evaluation was ongoing.  (*Id.*)  Dr. Horn also reported that the "reasonable medical basis" for

21

Vicari's pain was vestibular neuritis, and while the pain is variable, it is disabling to the extent

that it prevents Vicari from working full-time at even a sedentary position.  (*Id.*)

### 3.    The Findings of ALJ Michael Rodriguez

On April 10, 2012, ALJ Rodriguez issued his decision that Vicari was not disabled within

the meaning of § 216(i) and § 223(d) of the Act and was not disabled during the period at issue.

(Tr. at 26.)  The ALJ found that, although Vicari had severe impairments, they were not severe

enough to meet or medically equal the severity of one of the listed impairments of 20 C.F.R. §

404.1520(d).  (Tr. at 20.)

To reach this conclusion, the ALJ conducted the five-step sequential analysis as required

by 20 C.F.R. §§ 404.1520.  At step one, the ALJ determined that Vicari had not engaged in

substantial gainful activity since February 19, 2009.  (*Id.*)  At step two, the ALJ determined that

Vicari had the following severe impairments: "vertigo, right sided tinnitus and hearing loss, right

elbow epicondylitis, back pain and an adjustment disorder."  (*Id.*)  At step three, the ALJ

determined that Vicari did not have impairments that met or equaled those listed in the statute,

and thus Vicari was not presumed disabled. (*Id.*)  Citing to the consultative psychological

evaluation performed in February 2011, the ALJ concluded that Vicari had "moderate

restrictions in her activities of daily living, mild difficulties in her social functioning, moderate

difficulties in her concentration, persistence, or pace, and no episodes of decompensation."  (*Id.*)

Before continuing to step four, the ALJ assessed Vicari's RFC.  In making his

assessment, ALJ Rodriguez considered all of Vicari's symptoms and "the extent to which these

symptoms can reasonably be accepted as consistent with the objective medial evidence,"

including the intensity, persistence, and limiting effects of Vicari's symptoms, and the credibility

of her statements. (Tr. at 21.)  ALJ Rodriguez found that while the record indicated various

diagnoses, Vicari's own statements about her limitations were "clearly inconsistent with her admitted activities of daily living and the ample medical reports" in the record. (*Id.*)

The ALJ first summarized Vicari's medical records. He cited records from Doctors Stambaugh, Hammerschlag, and Weintraub for treatment regarding vertigo and right-ear tinnitus occurring from March 2009 through 2010. (*Id.*) These records indicated slight hearing loss in the right ear that was "within the normal range," and an ENG that revealed abnormality in Vicari's ability to follow an object smoothly while maintaining a stable image of it, but normal ability to respond to changes in head movement. (*Id.*) He also cited to an MRI scan of the brain and a CT scan that "failed to reveal any abnormality." (*Id.*) The ALJ discussed Vicari's December 18, 2009 evaluation at Johns Hopkins Hospital, which revealed that Vicari was oriented and coherent, "had full range of eye motion with no abnormal ocular misalignment or head tilt," and "slightly decreased" eye stability. (Tr. at 21–22.) Referring to this last evaluation, ALJ Rodriguez noted that Vicari's strength, extremities, senses, and coordination were intact, and that she could perform deep knee bends, walk on her toes and heels, and rise from a chair without using her hands. (Tr. at 22.) Her gait was fluid and audiology tests showed only slight hearing loss in the right ear. (*Id.*) The ALJ further wrote that the results from Johns Hopkins Hospital examination did not "highlight any clear etiology" for Vicari's reported symptoms, and noted that Dr. Zee, the examining doctor, thought Vicari "might have a migraine-related vestibular syndrome with associated psychophysiological vertigo syndrome." (*Id.*)

ALJ Rodriguez referenced records from Vicari's primary care physician, Dr. Horn, as confirmation of "a history of varying complaints including migraine headaches, right ear fullness and pain, and vertigo." (*Id.*) He then described Dr. Horn's examination of Vicari after her motor vehicle accident in August 2010, where Dr. Horn "noted some tenderness and muscle spasm to

the cervical spine, but identified no other abnormalit[ies]." (*Id.*)  The ALJ continued that "[s]ubsequent examinations noted some tenderness to the claimant's spine and right elbow, but sensation and strength in her extremities were intact." (*Id.*)  The ALJ found that Vicari's physical therapy "resulted in an improved condition with increased motion and less pain" and that Vicari "acknowledged that she was feeling better." (*Id.*)  He also considered that Vicari "had been working out more" in January 2011, "going to the fitness center three days a week" and "taking bike rides." (*Id.*)

The ALJ next described EMG/NCS findings that "reportedly revealed mild right carpal tunnel syndrome" and "MRI scans of the right elbow [that] showed mild lateral epiconlylitis." (*Id.*)  He referred to Dr. Robert Israelski's prescription of "a forearm therapy band and wrist splints" and how, in the following month, "Israelski observed that there was less elbow tenderness and full range of motion with no [wrist] pain." (*Id.*)  He further noted that when Vicari returned to Dr. Israelski "in October 2011, [she] no longer had significant pain" and her tennis elbow "had resolved." (*Id.*)

ALJ Rodriguez then turned to Dr. Philip's February 2011 consultative evaluation, describing the evaluation as "fairly benign." (Tr. at 23.)  He assigned "great weight to Dr. Philip's opinion" because her assessment was "well supported by the preponderance of the evidence of record and the claimant's activities of daily living." (*Id.*)  The ALJ also assigned "great weight" to Vicari's February 2011 consultative psychological examination, which found that Vicari was "able to follow and understand simple directions and instructions, perform simple rote tasks and several complex tasks independently, maintain a regular schedule, make appropriate decisions, [and] relate adequately with others and deal with stress." (*Id.*)  He found the assessment was "well supported by ample evaluations by both treating and examining

24

physicians." (*Id.*) He specifically referenced Vicari's discussions during the psychological exam, writing that Vicari "admitted that she was able to cook her meals in the microwave and manage her money," that she "socializes with friends," and that she "reported occasional feelings of hopelessness." (*Id.*)

Although ALJ Rodriguez found that Vicari's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he found that her statements regarding the "intensity, persistence and limiting effects" of her symptoms were inconsistent with the RFC he had identified, and therefore not credible. (*Id.*) He further found that the medical records failed to document chronic symptoms establishing debilitating pain. (*Id.*) First the ALJ cited "CAT scans and x-ray studies of the right elbow" which "were negative" and "MRI studies of the lumbar spine" that "revealed disc desiccation at L5-S1, with a disc bulge" but no "significant focal herniation" and "no canal stenosis or nerve root impingement." (*Id.*) He further found that the medical records did not reflect spinal abnormalities consistent with Vicari's reported symptoms. (*Id.*)

The ALJ next found that while the treating physicians' progress notes "reflect[ed] a multitude of subjective complaints," they were "not consistent with the objective medical data in either their nature or severity." (*Id.*) To support this finding, the ALJ noted that there was "no significant neurological disturbance," and no "objective testing to provide a basis for complaints of back, neck, or upper and lower extremity pain alleged by" Vicari. (Tr. at 24.) He found that progress notes described Vicari as "neurologically intact, with normal reflexes." (*Id.*) He further noted that while Vicari "complained of chronic dizziness that impaired her sense of balance and made walking difficult," examinations showed that she was "in no distress" and had "normal

ambulation." (*Id.*)  He additionally wrote that audiological tests revealed only "slight" hearing loss in the right ear that was "arguably still within normal limits." (*Id.*)

The ALJ found that contrary to Vicari's indication that "treatment has not improved her medical condition," medical notes in the record revealed that "physical therapy and various medications significantly reduced [Vicari]'s symptoms" and that her "physical health continued to improve." (*Id.*)  The ALJ next described how examinations of Vicari's "neck, back and right upper extremity disturbances" showed only moderate issues. (*Id.*)  The ALJ found that the medical evidence of record discredited Vicari by reflecting inconsistent "physician visits for numerous complaints that varied in their intensity as well as their description." (*Id.*)

ALJ Rodriguez then discussed the two physical capacities evaluations completed by Dr. Horn. (*Id.*)  He found Dr. Horn's evaluations "highly inconsistent" with Vicari's "practice of working out," as well as inconsistent with "progress notes, which fail[ed] to establish [] highly restricted abilities for physical functioning." (*Id.*)  The ALJ further noted that Dr. Horn had indicated that Vicari "could lift and carry up to 100 pounds." (*Id.*)  He found that Vicari "retains a greater capacity to lift and carry objects than she has currently alleged" and her subjective representations of her symptoms and limitations "exceeded examination findings." (*Id.*)  The ALJ then described a December 2011 evaluation by Dr. Horn, where Dr. Horn "suggested that [Vicari] could return to some type of work." (*Id.*)  As described by the ALJ, Vicari "stated that she would not be able to return to work in the same capacity as her prior job, but did not relate that she was precluded from all work activity." (Tr. at 24–25.)  According to ALJ Rodriguez, such "reports indicate that [Vicari]'s allegations concerning her symptoms and limitations are not fully credible to the extent alleged." (Tr. at 25.)

ALJ Rodriguez completed the pre-step four analysis by stating: "I must also question the viability of the claimant's motivation to work in light of the $2,400.00 a month sum granted to her by long-term disability insurance." (*Id.*)

The ALJ determined that Vicari had the RFC to perform sedentary work, in unskilled, low stress jobs that require only occasional decision-making or exercise of judgment in job performance, with occasional interaction with the public and frequent interaction with co-workers. (*Id.*) Having assessed Vicari's RFC, the ALJ continued to step four of the analysis, and determined that Vicari was unable to perform any past relevant work. (Tr. at 25.)

Finally, at step five of the analysis, the ALJ found that, given Vicari's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she could perform. (Tr. at 25-26; *see* 20 C.F.R. §§ 404.1569, 404.1569 (a).) The ALJ supported his finding with testimony from Vocational Expert Green. (*Id.*) Accordingly, ALJ Rodriguez found Vicari not disabled.

## III.   DISCUSSION

### A.   Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C.

27

§ 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986);

*accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's

decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g).  If the

Commissioner's decision meets both of these requirements, the reviewing court must affirm; if

not, the court may modify or reverse the Commissioner's decision, with or without remand.  *Id.*

     An ALJ's failure to apply the correct legal standard constitutes reversible error, provided

that the failure "might have affected the disposition of the case."  *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord*

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  This applies to an ALJ's failure to follow an

applicable statutory provision, regulation, or Social Security Ruling ("SSR").  *See, e.g.*, *Kohler*,

546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR).  In

such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning.  *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y. 2008)

(citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

     If the reviewing court is satisfied that the ALJ applied correct legal standards, then the

court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's

decision."  *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447–48.  The substantial evidence

standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, 01-CV-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

B.      **Determination of Disability**

1.      **Evaluation of Disability Claims**

Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. at

§§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A

claimant's impairments must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the

regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not,

determine whether the claimant possesses the RFC to perform his past work despite the

disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F.

Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at

the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant

is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5). A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."

20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.  The ALJ has

"discretion in weighing the credibility of the claimant's testimony in light of the other evidence

of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979));

*see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be

"consistent" with medical and other evidence); *Briscoe v. Astrue*, 11-CV-3509 (GWG), 2012

WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility

determination).  In making the determination of whether there is any other work the claimant can

perform, the Commissioner has the burden of showing that "there is other gainful work in the

national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d

Cir. 1998) (citation omitted).

     Vicari alleges that ALJ Rodriguez: (1) failed to comply with 20 C.F.R. § 414.1527 by

declining to accord controlling weight to the opinions of her treating physicians; (2) did not

properly evaluate the vocational evidence because Vicari was incapable of performing the tasks,

skills, and abilities of the alternate occupations proffered by the vocational expert; and (3) did

not properly evaluate Vicari's credibility because he compared her symptoms to his own RFC

assessment. (Pl. Mem. at 16-24.)  The Commissioner maintains that the ALJ's decision is

legally correct and supported by substantial evidence.  (Def. Mem. at 1.)

## 2.    The ALJ Failed to Follow the Treating Physician Rule

     The SSA regulations require the Commissioner to evaluate every medical opinion

received. *See* 20 C.F.R. § 404.1527(c); see also *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.

1993).  The opinion of a claimant's treating physician is generally given more weight than the

opinion of a consultative physician because the treating physician is likely "most able to provide

a detailed, longitudinal picture of [the claimant's] medical impairment(s)."  20 C.F.R. §§

32

404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)

(discussing the "treating physician rule of deference"). A treating physician's opinion is entitled

to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2).

If the treating physician's opinion is not given controlling weight, the Commissioner must

nevertheless determine what weight to give it by considering: (1) the length, nature, and

frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the

consistency of the opinion with the record as a whole; (4) the specialization of the physician; and

(5) any other relevant factors brought to the attention of the ALJ that support or contradict the

opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may

rely on the opinions of other physicians, even non-examining ones, but the same factors must be

weighed as enumerated above. 20 C.F.R. § 416.927(e). More weight must be given to a treating

physician than a non-treating one and to an examining source as opposed to a non-examining

source. 20 C.F.R. §§ 404.1527(c)-(e), 416.927(c)-(e).

The Commissioner's regulations provide that the ALJ must give "good reasons" for

rejecting a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ cannot reject a

treating physician's diagnosis without first attempting to fill clear gaps in the administrative

record. *Rosa,* 168 F.3d at 78 (finding that it was "entirely possible" that the treating physician, if

asked, "could have provided sufficient explanation for any seeming lack of support for his

ultimate diagnosis of complete disability") (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115,

118 (2d Cir. 1998)). "If an ALJ perceives inconsistencies in a treating physician's reports, the

ALJ bears an affirmative duty to seek out more information from the treating physician and to

develop the administrative record accordingly." *Id.* (citing *Harnett v. Apfel*, 21 F. Supp. 2d 217,

221 (E.D.N.Y. 1998) (internal citations omitted)).  Where there are deficiencies in the record, the

duty to develop the record exists even when the claimant is represented by counsel.  *Perez v.*

*Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  "The regulations also state that, '[w]hen the evidence we

receive from your treating physician . . . or other medical source . . . is inadequate for us to

determine whether you are disabled . . . [w]e will first recontact your treating physician . . . or

other medical source to determine whether the additional information we need is readily

available.'" *Id.* (citing 20 C.F.R. § 404.1512(e)).  The ALJ commits legal error by rejecting the

treating physician's medical assessment without fully developing the factual record.  *Rosa*, 168

F.3d at 78.  Further, in determining whether a claimant has a disability, "a consulting physician's

opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d

Cir.1990).  "[C]onsultative exams are often brief, are generally performed without benefit or

review of claimant's medical history and, at best, only give a glimpse of the claimant on a single

day." *Id.* at 13.

Vicari alleges that given the ALJ's decision to deny her claim, "it appears that [the ALJ]

completely dismissed the assessments offered by her treating physicians, although his decision

fails to state how much weight, if any, he gave to those doctors' opinions." (Pl. Mem. at 18.)

After considering Vicari's impairments, ALJ Rodriguez found that Vicari had the RFC for

unskilled sedentary work, as defined in 20 C.F.R. §§ 404.1567(a).  In determining Vicari's RFC,

the ALJ failed to delineate the weight given to treating physician's opinions, finding generally

that the progress notes from treating physicians reflected subjective complaints inconsistent with

objective medical data in the record, yet accorded "great weight" to consultative examinations by

SSA doctors.  (Tr. at 23.)

Dr. Horn served as Vicari's primary care physician from February 2009 through January 2012. Her progress notes chronicle the unpredictable nature of Vicari's impairments and create a backdrop for the difficulties in diagnosing Vicari. Despite the fact that Horn had been evaluating Vicari from February 2009, the ALJ did not consider any of her examinations or corresponding progress notes from February 2009 through September 2010 other than to say that they confirmed "a history of varying complaints including migraine headaches, right ear fullness and pain, and vertigo." (Tr. at 22.) Instead, he referenced Dr. Horn's examination of Vicari after her August 2010 motor vehicle accident. (*Id.*)

In addition, the ALJ assigned "great weight" to both Dr. Philip and Dr. Helprin, two of Vicari's SSA consultative examiners, cited CAT scans and x-rays of the right elbow and to an MRI of the lumbar spine, to support his contention that "[a]mple medical records fail to document chronic symptoms that have resulted in functionally debilitating pain." (*Id.*) These references ignore Vicari's alleged impairments because of vertigo, dizziness, and headaches. Additionally, ALJ Rodriguez specifically assessed the significance of Vicari's MRI, noting that it did not show "significant focal herniation" or "canal stenosis or nerve root impingement." (*Id.*) These words, however, were not used in the MRI report itself, and suggest that the ALJ may have used his own medical opinion, rather than the medical opinions provided by treating physicians, to assess the report. An ALJ is not permitted to arbitrarily substitute his own medical judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

The ALJ further found that there were "no imaging studies of the cervical and thoracic spine to indicate abnormalities consistent with the reported symptoms." (Tr. at 23.) He supported this conclusion by lumping together the treating physicians' progress notes, saying that they "reflect a multitude of subjective complaints, [and] are not consistent with the objective

medical data in either their nature or severity." (*Id.*)  This broad statement, which fails to

specifically cite to any medical records, makes it difficult to discern how the ALJ reached his

decision to deny Vicari's claim.  It is also troubling, given the ALJ's selective presentation of

evidence and his improper description of certain medical records.  For example, the ALJ finds

that there is no "objective testing to provide a basis for complaints of back ... pain alleged by

Vicari." (Tr. at 24.)  Vicari's back pain, however, is detailed in hospital records, physical

therapy reports, medical records from Dr. Horn, and a lumbar MRI.  (Tr. at 271, 281, 284, 324–

25, 338, 553, 668, 687–88.)

     Further, the ALJ described Dr. Horn's December 2011 evaluation of Vicari by saying

that "Horn suggested that [Vicari] could return to some type of work." (Tr. at 24.)  The ALJ

misrepresents this medical record, which in fact says Vicari "had a very recent medical exam by

a neurologist selected by her employer.  Based on this report he recommended she should RTW

[return to work] in some capacity part-full [*sic*] time.  PCP [primary care physician] signed

acknowlegamnat [*sic*] of this, did not feel unreasonable [*sic*] she could resume some work." (Tr.

at 739.)  Dr. Horn signed this report, but it is unclear whether Horn is the "PCP" referenced.  If

the ALJ was not clear whom "PCP" referred to, he should have clarified.  *See* 20 C.F.R. §

416.912(e)(1); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[I]f the clinical findings were

inadequate, it was the ALJ's duty to seek additional information").  Still further, the statement

that the PCP "did not feel [it] unreasonable" that Vicari could resume some work is not, as ALJ

Rodriguez claimed, the same as suggesting that Vicari could return to work.  Ultimately, the

ALJ's reasoning falls short of the "good reasons" standard.  20 C.F.R. § 404.1527(c)(2).

     Finally, the ALJ did not fully consider the length, nature, and extent of the various

medical sources' treatment relationships with Vicari.  He grouped them together and largely

dismissed them, rather than considering their collective knowledge of Vicari's ongoing symptoms, the difficulty diagnosing her physical impairments, and the variety of her treatment. (Tr. at 663–66, 733–35.) *See Kneeple v. Colvin*, 14-CV-33 (JTC), 2015 WL 7431398, at \*7 (W.D.N.Y. Nov. 23, 2015).

### 3.   The ALJ's Decision is Not Supported by Substantial Evidence in the Record

#### a.   The ALJ Did Not Properly Evaluate Vicari's Credibility

"[T]he ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of his pain and other subjectively perceived conditions, and his resulting limitations." *Cabreja v. Colvin*, 14-CV-4658 (VSB), 2015 WL 6503824, at \*32 (S.D.N.Y. Oct. 27, 2015). Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. *Id.* at \*32 (citing *Harris v. R.R. Ret. Bd.*, 948 F.2d 123 (2d Cir. 1991) (internal citation omitted)).

An ALJ must apply a two-step process to evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 96–7p, 1996 WL 374186, at \*6–9 (July 2, 1996) (summarizing evaluation process). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the ... symptoms alleged by the claimant." *Martinez v. Astrue*, 06-CV-3384 (PAC) (HBP), 2009 WL 2168732, at \*16 (S.D.N.Y. July 16, 2009) (citing *McCarthy v. Astrue*, 07-CV-0300 (JCF), 2007 WL 4444976, at \*8 (S.D.N.Y. Dec. 18, 2007)); *see also* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" *Peck v. Astrue*, 07-CV-3762 (NGG), 2010 WL 3125950, at \*4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R.

§ 404.1529(c)); *accord Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20

C.F.R. § 404.1529(c)(3)(i)-(vii); *Taylor v. Barnhart*, 83 F. App'x 347, 350–51 (2d Cir. 2003)).

"To the extent that the claimant's 'pain contentions are not substantiated by the objective medical

evidence,' the ALJ must evaluate the claimant's credibility." *Peck*, 2010 WL 3125950, at *4

(citing 20 C.F.R. § 404 .1529(c)); *see also Meadors*, 370 F. App'x at 183–84 (citing 20 C.F.R. §

404.1529(c)(3)(i)-(vii); *Taylor*, 83 F. App'x at 350–51).

Importantly, "the second stage of [the] analysis may itself involve two parts." *Sanchez v.*

*Astrue*, 07-CV-9318 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ

must decide whether objective evidence, on its own, substantiates the *extent* of the alleged

symptoms (as opposed to the question in the first step of whether objective evidence establishes

a condition that could 'reasonably be expected' to produce such symptoms)." *Id.* (emphasis in

original). Then, "if it does not, the ALJ must gauge a claimant's credibility regarding the alleged

symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and

416.929(c)(3)]." *Id.* (citing *Gittens v. Astrue*, 07-CV-1397 (GAY), 2008 WL 2787723, at *5

(S.D.N .Y. June 23, 2008)). The seven factors are: (1) an individual's daily activities; (2) the

location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate

and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication

that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other

than medication, that the individual receives or has received for pain or other symptoms; (6)

measures other than treatment the individual uses or has used to relieve pain or other symptoms;

and (7) other factors concerning the individual's functional limitations and restrictions due to

pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *see also Bush v. Shalala*, 94 F.3d 40, 46

n.4 (2d Cir. 1996); *Wright v. Astrue*, 06-CV-6014 (FB), 2008 WL 620733, at *3 (E.D.N.Y. Mar.

5, 2008) (citing SSR 96–7p).  "Only allegations beyond what is substantiated by medical

evidence are to be subjected to a credibility analysis ... [because requiring] plaintiff to fully

substantiate [his] symptoms with medical evidence would be both in abrogation of the

regulations and against their stated purpose." *Martin v. Astrue*, 07-CV-3911 (LAP), 2009 WL

2356118, at *10 (S.D.N.Y. July 30, 2009) (internal citations omitted).  Remand is appropriate if

ALJ does not follow these steps. *Sanchez*, 2010 WL 101501, at *15 (citing 20 C.F.R. §

404.1529(c)).

      Given these standards, there are errors in the ALJ's assessment of Vicari's credibility.  At

the outset of his pre-step four analysis, ALJ Rodriguez did find that Vicari's "medically

determinable impairments could reasonably be expected to cause her alleged symptoms." (Tr. at

23.)  However, when he proceeded with the pre-step four analysis, his determinations were

flawed.  "Before finding that [Vicari] was not a credible reporter of her own limitations, the ALJ

was required to consider all of the evidence of record, including [Vicari's] testimony and other

statements with respect to her daily activities.  20 C.F.R. §§ 404.1529, 404.1545(a)(3).  ALJ

Rodriguez misunderstood Vicari's statements and thus could not "have complied with the

requirement that they be taken into account." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010)

(ALJ's holding that claimant was able to perform daily tasks was inaccurate where he

misrepresented a medical questionnaire and misunderstood testimony and written statements that

referenced different time periods).

      Vicari testified at length about the sudden onset of her symptoms, the severity of her

headaches, the ineffectiveness and changing nature of her prescribed medications, and the fact

that, as of the date of the hearing, her symptoms were basically "the same, if not a little worse at

times" from their sudden onset in February 2009. (Tr. at 51–55.)  She further testified about the

specific debilitating nature of her impairments, describing that she feels pain equivalent to a "knife stab" in her right ear, has lost her balance and fallen, cannot drive, and sometimes feels as if she is in a "fog" from her medications.  (Tr. at 62–63.)

Despite this testimony, ALJ Rodriguez did not credit Vicari, but rather placed "great weight" on Vicari's consultative psychological examination, during which Vicari "admitted that she was able to cook her meals in the microwave and manage her money" and "socialize[d] with friends." (Tr. at 23.)  The ALJ's determination was based on a misrepresentation of Vicari's psychological examination.  Dr. Helprin's report of the examination says Vicari was:

> [A]ble to microwave foods with cooking *limited by her physical problems including problems turning an [sic] bending and also reporting dizziness*. She is unable to clean, do laundry, or food shopping for the same reasons. She state[d] she is able to manage her own money online.  She state[d] she socializes with friends *rarely* especially with her exhaustion and dizziness later in the day, but can socialize earlier.

(Tr. at 431.) (emphasis added).  The ALJ may not assign conclusive weight to a claimant's daily activities in determining whether a person is capable of maintaining employment. *Vasquez v. Barnhart*, No. 02–CV–6751, 2004 WL 725322, at *11 (E.D.N.Y. Mar. 2, 2004).  A claimant "need not be an invalid to be found disabled." *Balsamo*, 142 F.2d at 81.  Moreover, when a person chooses to endure pain in order to participate in daily living activities, the ALJ should not "hold this endurance against [her] in determining benefits unless [the] conduct truly showed that [the claimant] is capable of working." *Balsamo*, 142 F.2d at 81–82.  Vicari's ability to occasionally use the microwave or manage money does not indicate that she is capable of working.

Assuming *arguendo* that the ALJ placed considerable weight on Vicari's hearing testimony that she tries to "live a normal life" by trying to take trips to the mall, "[t]here is a big difference … between an occasional walk or shopping trip and sitting/standing for an eight hour

workday." *Molina v. Colvin*, 13-CV-4989 (AJP), 2014 WL 3445335, at *15 (S.D.N.Y. July 15,

2014) (citing cases). Additionally, Vicari's daily activities, like listening "to music at times,"

watching television on a "limited basis," and checking "email for about fifteen minutes" per day,

occurred for such insignificant amounts of time that they should not be used against Vicari.

*Balsamo*, 142 F.3d at 81 (holding that because plaintiff did not read, watch television, listen to

the radio, or ride buses and subways for any sustained period of time "comparable to those

required to hold a sedentary job," plaintiff's ability to perform these activities will not count

against plaintiff in finding that plaintiff is disabled).

The ALJ went on to say that Dr. Horn's Physical Capacities Evaluations show Vicari

"retains a greater capacity to lift and carry objects than she has currently alleged." As an

example, he pointed to Dr. Horn's second evaluation, in which she indicated that Vicari could lift

and carry up to 100 pounds. (Tr. at 24.) The ALJ, however, should have clarified whether that

notation was accurate. It is not common for even a relatively healthy person to be able to lift and

carry 100 pounds. The issue is further exacerbated given that Vicari's testimony before the ALJ

does not include any discussion of her capacity to lift and carry. ALJ Rodriquez's finding that

Vicari is not credible was based on his misreading and misrepresentation of the evidence.

*Genier*, 606 F.3d at 50. The ALJ's conclusion that Vicari holds a capacity to lift and carry based

on an implausible assertion that was not clarified or explored through further testimony does "not

comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence."

*Id.; see also* 20 C.F.R. § 404.1545(a)(3).

Furthermore, the ALJ questioned the consistency of Vicari's complaints, yet failed to

credit or fully describe the difficulty doctors were having in diagnosing and treating Vicari,

while simultaneously misrepresenting information about her medications. Vicari herself testified

that her treating physicians frequently tell her she is a "difficult case." (Tr. at 61.) The ALJ

found that "various medications significantly reduced the claimant's symptoms." (Tr. at 24.)

This is counter to Vicari's testimony regarding medication that "[t]he only other thing that [her]

primary doctor actually … put [her] on that seemed to at least help with the [] dizziness and the

inflammation was Cymbalta." (Tr. at 55.) It also fails to consider the testimony that use of

Cymbalta puts Vicari in "a fog," making focusing and concentration difficult. (Tr. at 63–64.)

The repeated change in Vicari's prescriptions reflects that the medications were not as effective

as the ALJ purports. Doctors Horn, Weintraub, and Bryson all changed Vicari's medications

over the course of her treatment because of their ineffectiveness. (Tr. at 230, 310, 345.) Further,

it is not clear which medications the ALJ is referencing when he finds that they have

"significantly reduced" Vicari's symptoms. He does not name any medications in his opinion or

even cite to medical reports discussing medication. (Tr. at 24.) The ALJ takes further liberties

when he finds that "progress notes reveal that [Vicari]'s physical health continued to improve."

(*Id.*) Just as with his generic reference to medication, ALJ Rodriguez does not cite to any

particular progress notes to support his "continual improvement" conclusion.

The ALJ's assessment of Vicari's credibilty is further suspect given his explicit

statement: "I must also question the viability of the claimant's motivation to work in light of the

$2,400.00 a month sum granted to her by long-term disability." (Tr. at 25.) *See Clark v. Colvin*,

13-CV-1872, 2015 WL 4099813, at *6 (N.D. Illinois, July 6, 2015) ("Upon remand, the ALJ

shall not consider Claimant's receipt of long-term disability benefits in evaluating Claimant's

credibility.")

The ALJ failed to assess all relevant medical evidence and incorrectly afforded

conclusive weight to Vicari's report of her daily living activities. Thus, the ALJ's determination

42

was not supported by substantial evidence in the record.  *See* 20 C.F.R. § 404.1545(3); *see also*

*Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires

remand).

### b.    The ALJ Did Not Evaluate All Relevant Evidence

Among the ALJ's legal obligations is the duty to adequately explain his reasoning in

making the findings on which his ultimate decision rests, and to address all pertinent evidence.

*Calzada*, 753 F. Supp. 2d at 269.  The crucial factors in any determination must be set forth with

sufficient specificity to enable the reviewing court to decide whether the determination was

supported by substantial evidence, and the ALJ's failure to acknowledge relevant evidence or to

explain its implicit rejection is plain error.  *Id.*

ALJ Rodriguez failed to properly incorporate treating physicians' findings into his

analysis.  He did not consider Dr. Hammerschlag's May 20, 2009 Attending Physician Statement

for Vicari's insurance provider, in which he diagnosed her with Atypical Meniere's Disease and

commented that "it is unclear when [Vicari] will be ready to resume normal activities; it depends

on how well she does with vestibular therapy."  (Tr. at 573–74.)

Further, the ALJ's consideration of Dr. Israelski's diagnosis that Vicari suffered from

tennis elbow and carpal tunnel syndrome in her right arm, is flawed in that it describes her lateral

epicondlyitis as "resolved" in October 2011, despite that fact that Dr. Israelski's January 1, 2012

evaluation notes "significant right lateral epicondylitis …"  (Tr. at 849–58.)

The ALJ cannot fail to include medical evidence simply because it is counter to his

conclusion.  *See Ramos v. Barnhart*, 02-CV-3127 (LAP) (GWG), 2003 WL 21032012 at *7, *9

(S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention … [treating physician] evidence and set

forth the reasons for his conclusions with sufficient specificity hinders [the Court's] ability … to

decide whether his determination is supported by substantial evidence.'"). These findings and progress notes create context for Vicari's impairments, and are thus pertinent components of the ALJ's analysis. The ALJ's failure to consider this relevant evidence or to explain its implicit rejection is plain error. *Calzada*, 753 F. Supp. 2d at 269.

**c.    The ALJ Failed to Properly Assess the Vocational Expert's Testimony**

A vocational expert may testify, based on a hypothetical question, to the existence and number of jobs in the national economy that a claimant with a particular RFC can perform. *See* 20 C.F.R. § 416.966(e). ALJ Rodriguez relied on Vocational Expert Green's response to the initial hypothetical regarding the availability of jobs for an individual capable of performing unskilled sedentary work. (Tr. at 68.) This was inappropriate, however, because it ignored the vocational expert's response to a modified hypothetical. This second hypothetical focused on the availability of jobs for a person who would have unscheduled absences at least twice per month and would require fifteen percent of each workday, off task, in isolation, exercisable at the individual's demand, without having to seek supervisory approval every time. (Tr. at 69-70.) By both ignoring and misconstruing the vocational expert's responses to the hypotheticals, the ALJ failed to accurately assess all relevant evidence, and thus, his determination was not supported by substantial evidence in the record. *See 20* C.F.R. § 404.1545(3).

Finally, this Court does not find merit in Vicari's allegation that, because of his reliance on Vocational Expert Green's list of alternative jobs taken from the *Dictionary of Occupational Titles* ("DOT"), ALJ Rodriguez failed to meet his burden of showing there was other gainful work that Vicari could perform. Vicari's contention is that the jobs presented were not viable alternatives because Green identified them from the DOT rather than the updated O*Net

system.[15]  Pursuant to § 404.1566(d), the Commissioner "will take administrative notice of

reliable job information available from various governmental and other publications."  Section

404.1566(d) explicitly cites the "Dictionary of Occupational Titles, published by the Department

of Labor" as providing "reliable job information."  Contrary to Vicari's contention that O*NET

has replaced the DOT, the SSA has stated a plan to replace the DOT with an "an occupational

information system (OIS)."[16]  Until that time, or until any change to § 404.1566(d), this Court

will continue to consider the DOT a permissible source for disability adjudications.[17]

## C.    Remand

Vicari requests that the Commissioner's decision be reversed, or, in the alternative,

remanded for reconsideration.  (Pl. Mem. at 1.)  Remand for further administrative proceedings

is appropriate "[w]here there are gaps in the administrative record or the ALJ has applied an

improper legal standard."  *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  The ALJ's

failure to fully develop the record and his explicit assignment of "great weight" to the

consultative examiners' opinions, without a satisfactory explanation of the weight given to

Vicari's treating physicians, leads this Court to recommend this case be remanded to allow the

ALJ to reweigh the evidence, developing the record as needed.  *Halloran*, 362 F.3d at 32 ("We

---

[15] "The Occupational Information Network (O*NET) is a database of occupational requirements and worker attributes.  It describes occupations in terms of the skills and knowledge required, how the work is performed, and typical work settings." *O*Net – beyond information – intelligence*, DEPT. OF LABOR (Feb. 2, 2010), https://www.doleta.gov/programs/onet/ (last visited April 19, 2016).
[16] The SSA "hope[s] that disability adjudicators can begin using the new data in 2019." *Occupational Information System Project*, SSA (2016), https://www.ssa.gov/disabilityresearch/occupational_info_systems.html (last visited April 19, 2016).
[17] Courts have taken various positions on the continued use of O*Net as a legitimate source.  *Compare Lee v. Barnhart*, 63 Fed. Appx. 291, 292-93 (9th Cir. 2003) (federal law "does not preclude reliance on the O*Net), and *Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *7 (C.D. Ill. June 22, 2010) ("[T]he VE is not required to limit his hypothetical to DOT data; the VE can also use outside data, including ONET."), with *Cunningham v. Astrue*, 360 Fed. Appx. 606, 616 (6th Cir. 2010) ("[T]he Department of Labor replaced the DOT with the Occupational Information Network (O*NET), a database that is continually updated based on data collection efforts that began in 2001."), and *Horsley v. Commissioner of Social Security*, 11-CV-703, 2013 WL 980315 (S.D. Ohio Mar. 13, 2013) (noting O*Net has "superceded [*sic*] the DOT as the federal government's primary source of occupational information ....") (citation omitted).

do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

## IV.    CONCLUSION

For the reasons set forth above, I recommend that Vicari's motion for judgment on the pleadings be **GRANTED**, the Commissioner's motion for judgment on the pleadings be **DENIED**, and that the case be **REMANDED** for further administrative proceedings.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, 40 Foley Square, Room 2204, New York, New York, 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, New York, 10007.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

SO ORDERED this 22nd day of June 2016.
New York, New York

The Honorable Ronald L. Ellis
United States Magistrate Judge